The next case on our calendar, which is United States v. Gerald Scott. Thank you. Counsel, it's rare to see the government on that side of the, uh... Good morning. May it please the court, Juan Shin for the United States. I represent the United States in this appeal, though I did not participate in the proceedings below. The district court's order granting section 2255 relief should be reversed, or the alternative, the judgment should be vacated and remanded for resentencing. So, first, New York manslaughter in the first degree, and in particular subdivision 1 of that statute, is a violent felony under the Armed Career Criminal Acts Force Clause. Now, the relevant felony here under New York law provides, quote, with intent to cause physical injury to another person, causing the death of such person or other person is first degree manslaughter. Now, the defendant's argument here is premised on that statute applying to a failure to act. But under this court's decision in Hill, he has to be able to point to a case where it has actually been implied in that fashion. So, I will grant that there are cases, Steinberg and Wong, in which the New York Court of Appeals says in dicta that an omission theory would be permissible under that statute. However, it was dicta. The court in both of those cases, first in Steinberg, it actually relied on a combination of affirmative act, the affirmative beating of the child together with the failure to provide care. And then Wong, the court actually reversed the convictions of both defendants because the prosecution there wasn't able to establish that the passive defendant actually was aware of the partner's shaking of the baby. And so, under this court's reasoning in Hill, the defendant still hasn't pointed to a case where it has actually been applied. And so, that is one simple way to resolve this appeal. This is not something that's conjured up out of thin air. I mean, you have the affirmative statement by the highest court of New York. This is not like the kind of thing where a lawyer goes and thinks up some crazy hypothetical that's never likely to happen. I grant that, Your Honor. There is a discussion in dicta in those cases. But I'll quickly move on then to our principal point. Even if this court were to accept that dicta as establishing the requirement under Hill of being able to point to a case, even if that were the case, still ACCA's force requirement would be satisfied here. And that follows plainly from Johnson and Castleman. Now, Johnson says that the physical force requirement under ACCA's force clause is satisfied by any force capable of causing physical pain or injury to another person. And in Johnson and Castleman, in Castleman in particular, both the majority and Justice Scalia in concurrence, and of course Justice Scalia was the author of Johnson, but both of those opinions recognize that it's impossible to cause bodily injury without applying force that satisfies the force clause. Why wasn't Castleman strictly limited to the domestic violence circumstance? Wasn't that the intent of Castleman? Not that part of the opinion, Your Honor. And that part of the opinion that discusses the use of indirect force. So this is a passage in Castleman which discusses indirect force and it discusses this famous now sprinkling poison hypothetical which has been discussed again and again in the cases. So that discussion where Castleman says indirect force including that hypothetical qualifies and what the courts of appeals have nearly uniformly held and what this court has held twice is that that reasoning applies to ACCA and the definition of a crime of violence analogously. It's not limited to the particular domestic violence misdemeanor that was at issue in Castleman. It applies more broadly. And that makes perfect sense because ultimately the reasoning there is more widely applicable. What Castleman explained is that the physical force that's relevant is not how one triggers the chain of events. It's not the actual sprinkling of the poison into the drink or the food. The relevant force is what's happening to the victim. And this court said precisely that in Villanueva where it said applying Castleman and that was an ACCA case, Villanueva, it said that it focuses on the causation of a consequence, not the physical act of initiating the action that leads to that consequence. And so the relevant fact in the poison hypothetical is the impact of the substance, the poison, on the victim. So I'm going to comment more along the lines that pulling a trigger is a very gentle motion as is sprinkling poison into a glass, but they are actions that have violent consequences. But there is nonetheless an action that causes violent consequences as opposed to no action whatsoever, as opposed to simply not moving, not blinking, not simply doing nothing in the face of a circumstance that can have... Omission, in other words. That's true enough. So the discussion in Castleman and the discussion in Villanueva did involve that extraordinarily minimal use of force, the sprinkling of the poison. However... The statute here, you can be convicted without simply doing nothing. So if we accept the dicta in Steinberg and Wong, even so the logic of Castleman applies to pure omissions in the face of a legal duty. And so what I can point to, Your Honor, is in Hill... We would deem a person to have employed force that results in the death because Castleman tells us that kind of injury can't happen without force. The defendant employs that force when he deliberately fails to prevent it. Is that your theory? Exactly, Your Honor. I find it curious that we're talking about all of this in the case of a defendant who put bullets into somebody's head, but there you go with the categorical analysis requirement. But is that the idea that a failure to act means you have assumed responsibility for the force that ultimately takes the life? Yes, Your Honor, that's exactly right. Where is that ever said? I'll point you to a couple of places, Your Honor. So first, Judge Raggi's description there of actually employing that force that exists. You're doing nothing, let's agree. Right, right. You're doing nothing, and yet you're saying you're employing force? Right. Explain that. Yes, Your Honor. So first, conceptually, and then I'll point to some cases. So conceptually, Judge Raggi is absolutely right. Even in an omission scenario, and remember here, even under Steinberg and Wong's dicta, the omission makes one liable only if one has a duty to act, as with a parent providing medical care or food to one's child. Not an intent for the ensuing injury. Precisely, Your Honor. And so if with those legal duties and with the requisite intent to cause a serious bodily injury, if one fails to comply with that duty, one is employing the force. And here's how. There's language in the Vargas-Sarmiento case. Now, I'll acknowledge Vargas-Sarmiento is a pre-Johnson case, but it actually anticipates Castleman's reasoning precisely, and so I think it's important persuasive reasoning. So the metaphor that's employed there, admittedly in the context of the poison scenario, it's the concept of the defendant availing himself or availing herself of that force that's happening. So in the poison scenario, one's availing oneself of the effect of the poison on the human body, but even in a pure omission case, as when a child is being starved by the parents, or as when a child is bleeding out from some injury and no medical attention is being called upon. Even in those scenarios, when a defendant with a legal duty to act and with the intent to cause serious bodily injury, if those elements are satisfied, he or she is availing him or herself with the effect, the physical effect of those, the disease, the injury, or the starvation on that human body. I don't think the Court of Appeals found intent in Steinberg or Wong. I don't think they found intent to cause bodily injury. They found passive omission of an act. I don't think they found intent. Your Honor, if we're going to rely on the words of the Court of Appeals, so in Steinberg, it explicitly says, the failure to obtain medical care, again, this is the dicta, could support a first-degree manslaughter charge so long as there is sufficient proof of the requisite mens rea intent to cause serious physical injury. Now, in that case... In the theory, if I'm looking at it for first-degree manslaughter, I said Steinberg is acts or omissions each with intent to cause serious physical injury. Is that the standard in New York for first-degree manslaughter? It is, and that's exactly what the statute says. This is not something that's judicially glossed. The statute says it begins with intent to cause serious physical injury, so it couldn't be more clear. So just returning to the point of how a pure omission could be the use of force, I think this concept of availing oneself of what's happening there, when one has a legal duty to act and has that intent to have that serious physical injury result, one is availing him or herself of that force. And so, again, that was Vargas Sarmiento. How has this been applied? So first in Hill. So Hill principally talks about the sprinkling poison hypothetical, but the defendant there did not raise that as the only hypothetical. The defendant also said, well, what about withholding vital medicine from the victim? And that's at page 58 of Hill. So that is an omission hypothetical, and the Court rejected that along with the sprinkling poison hypothetical. So we have that there. Rejected the notion that it could not be a violent crime. Precisely, Your Honor. So there the Court said that Hobbs Act robbery is categorically a crime of violence under 924C, under the force clause, and it rejected the withholding vital medicine from the victim. So that's an omission theory that was approved in Hill. Counsel, you know that the Second Circuit didn't invent modified categorical approach. It's not our doing that that's how we analyze statutes. Isn't that correct? Come from on high. We're bound by it, aren't we? Absolutely, Your Honor. And of course this Court is bound by Johnson, Castleman, Hill, and Villanueva. And so all those cases which are applying either the categorical or modified categorical depending on the particular statute, they lead to that conclusion that when one intends to cause serious bodily injury and then the death results, even in a case of an omission, the physical force is being employed by the defendant. And just before we move on... Your time is up. My time is up, but just if I could finish. This has all been in response to Your Honor's question of where do we get this omission theory from. So there are a number of cases from other circuits that have expressly adopted the omission theory. So in other words, they have said that even in the case of a pure omission, the force required under Johnson and Castleman is satisfied. And I'll point to a couple in particular because they have particularly persuasive reasoning, and it's specifically with respect to hypotheticals like the one here. So the Peoples case out of the Eighth Circuit, so there it specifically discussed the hypothetical of withholding food with the intent of causing the dependent to starve to death. It said there that's the use of force, even though that's an indirect use of force, and it relied on Castleman and Johnson. I'd point to Jennings and Waters out of the Seventh Circuit. So again, in Jennings, the court there said... It talked about the examples of withholding an EpiPen from someone who is suffering from a severe allergic reaction. Again, the court there recognized under Johnson and Castleman that that is force employed, violent force employed. On Taveros, the Tenth Circuit, there it said that a son neglecting to care for his father, so presumably there were some... They're not considering your brief, are they not? They are, but I wanted to point the court to this particular language because not all of the cases expressly address this sort of omission case, but I wanted to address the court particularly to those because they're particularly important here. Thank you. Thank you, Your Honor. I reserve some time for a bow. Thank you. We'll hear from the appellant... the appellee. I'll leave this time, Your Honor. That's nice. It is. It's nice to have a little change of pace. Good morning, Your Honors. Matt Larson of the Federal Defenders for Mr. Scott. I'll quote from three Supreme Court opinions. Use requires active employment. Leo Cowell. The various definitions of use imply action. Bailey. We cannot forget, the court said in Johnson, that ACCA is limited to violent active crimes. Your Honors, a crime that can be committed by inaction does not fit that bill. But how do we deal with the Castleman language that basically it's impossible to cause bodily injury without applying force, and it's hard to imagine more bodily injury than death? So how do we deal with that? Castleman, as Judge Swain and several other jurists and circuits have recognized, does not speak to this issue because the question wasn't presented in Castleman. In Castleman, the court was considering a tenancy assault that requires, quote, the application of force on the victim. There was no offense alleged in Castleman that can be committed by inaction. Mr. Castleman's argument was that he can commit assault indirectly and that should not count. The court rejected that argument, as did this court in the Vargas-Sarmiento decision several years earlier. But Your Honors, here we're not talking about the indirect use of force. We're talking about no use of force. What Castleman was specifically addressing was the district court's view that one can cause bodily injury without the use of physical force. And it discusses that and then concludes it is impossible to cause bodily injury without applying force in the common law sense. I don't see how we can ignore that. And now we get to whether or not... Force definitely kills someone when they're murdered. And whether a person who intends for that result, intends for that injury, and omits to take action that would stop it, basically adopts the force that's going to kill the person. Your Honor, I... You know, Counsel's argument from one of the cases he cited was, you know someone's going to die without the EpiPen. You want them to die, and so you withhold it from them. You know, if you need an example of this, you have to watch the last act of The Little Foxes for how Betty Davis kills her husband, but that's another matter. But why isn't that? You've adopted the force that kills the person. You've made it your agent. Your Honor, I agree with you that in some sense one can say the person used force, because language is elastic, and words in our language can mean almost anything. But when we're interpreting statutory language, we look at the words and we give them their ordinary meaning. Now consider the circumstance where a caregiver, such as a nurse or a homemaid, is caring for an elderly person in their home. The elderly person has gotten on the nurse's nerves for weeks, driving crazy with complaints and requests, and suddenly the elderly person begins to experience what appears to be a mild heart attack. Now the nurse does nothing. She says, ah, here's my opportunity. You know, this person deserves it. They've been aggravating me. The person suffers this mild heart attack. The person does nothing. The person is guilty of New York manslaughter. But if that elderly person should die, in ordinary language we would say the person died of a heart attack. We wouldn't say the nurse used the heart attack to kill the person. When the force is independent of what the individual does, there is no initiating of the force. In the Villanueva case, when the court was talking about use of force, it talked about initiating things, setting things, beginning a chain of events, setting them in action. But here... No act, you mean, has to take place. Precisely. But here, with this offense, the force can be entirely independent of what the individual does. Now... But the language of the statute is employs force. It's not does something that triggers force or any... There's nothing that suggests that you have to be part of a chain if you were going to stick with the language. It's employs force, right? It's uses force, Your Honor. Uses force. And so I've quoted the three cases from the Supreme Court that define what use means. It says active use. And the chain language I just quoted comes from this Court's decision in Vargas-Sarmiento on page 178. And the initiating language comes from the Villanueva decision from this summer. So that's how this Court has interpreted use of force. There has to be action. It can be slight, and it can be indirect. But it has to be action. Here, here the offense is inaction. That is why this is different from the other cases, the other offenses. Isn't that the relevance of this is a mandatory, a mandatory sentencing provision? That's certainly relevant. Lenaty would also suggest if there's a question here about how we best interpret the language in NACA, the draw goes in Mr. Scott's favor, given the harsh penalty at issue here, a mandatory minimum of 15 years. It certainly is relevant, Your Honor. I mean, there's nothing that stops the judge from sentencing at the level that has been set as a mandatory minimum, and indeed well above that, when the facts call for it. And indeed, under current sentencing, it wasn't true before, under current sentencing, the prosecutor, the government, can appeal an inadequate sentence and cause it to be raised by the Court of Appeals. And certainly here the government has not alleged that the sentence Mr. Scott received on resentencing is unreasonable. Judge Swain gave a detailed accounting of the resentencing as to why... More than the minimum of what he would have been sentenced to if ACCA wasn't employed. Correct. Correct. And she documented why all the facts of Mr. Scott's life in the 11-plus years he's already spent in prison warranted his release now, and he's now on supervised release. So it's certainly relevant, Your Honor. Yes, we're dealing with a draconian minimum here, and we have to be very careful, especially given... Scott is not the poster boy for lenience in sentencing. I was talking more generally about the fact... I mean, arguably a good case can be made that the sentence of Scott was inadequate and was appealable on that basis, regardless of mandatory minimum. But as a more general proposition... The justification for mandatory minimums, which their only effect is to compel judges... Their only effect in the world is to compel judges to give sentences higher than they otherwise would have given, because if the judge would have given that serious a sentence because of the facts of the case, the mandatory does nothing. I would agree with Your Honor's general point that this offense, manslaughter, is not necessarily the poster child. And I share the Court's, or some observer's, frustration in saying, wait a minute, manslaughter is not a crime of violence? But the problem is that this is the Supreme Court's doing. Manslaughter was and is a crime of violence under the residual clause of ACCA, and always has been. And in Vargas Armiento, this very Court said this very offense fits the residual clause of Section 16. But that clause doesn't exist anymore. Correct, as well. So here the Supreme Court has struck down the residual clauses, and the government has now pivoted and tried to shoehorn offenses that have always fallen under the residual clause into the force clause. And many courts have commented on this. And it may be frustrating to observers, and it may be something that Congress needs to fix. This is a gap to fill. But it's a gap to fill by Congress, not by... That's what Judge Rashi said. Here's a guy who shot two bullets into someone's head, I think, or shoulder, or head and shoulder. Indeed. And yet he didn't commit the force necessary to trigger the statute. As Your Honor said moments ago, under the categorical approach, we do not look at those facts. And judges have certainly expressed dissatisfaction with the categorical approach. But that is the approach that applies here. Right. It is frustrating, though. I mean, you can understand that. As a citizen, as a member of the community, yes, I can understand. And certainly when I try to explain this to my friends who are not lawyers, it may sound crazy. But this is a very technical area of law, and Your Honor commented in her opinion in Villanueva that, especially given the mandatory penalties, especially given how complex this is, this case feels like a law school exam to me. But given the complexity, it requires, as Your Honor said, meticulous attention. And we have to be very careful. And here we've explained why use requires action, but this offense can be committed by inaction. The government has cited no case saying that an offense of inaction qualifies. No case in this circuit, I should say. You cite Hill, which says that just because you can imagine an omission that does not involve the defendant using any initiating action himself doesn't mean that's how New York prosecutes it. And Hill suggests that if the defendant's case doesn't provide an example that's devoid of force, you have to point to some case where New York has prosecuted in those circumstances. What case can you point to? Well, Hilton is the standard here, Your Honor. Hilton or Hylton, I'm not sure of the pronunciation, but Hilton v. Sessions, an opinion from last year, it says we do not use the realistic probability test. We do not ask for a case when the statute on the face of it is overbroad. And here it is. The statute requires two things. Intent to cause serious injury and resulting death. There's no element in that language requiring the use of force. Moreover, we have New York's highest court telling us that the offense doesn't require the use of force because it can be committed by omission. It is... But wait. Hasselman tells us you can't have a dead body without the use of force, whether the defendant used it or not may be a question, but the crime necessarily involves the use of force. The context... You're saying, oh, but, you know, the defendant may not have been the person who set in motion the actual force, however much he may have intended it. And I'm saying to you, where has New York ever used the statute in those circumstances? The question under the categorical is whether the offense itself is overbroad when compared to the federal offense. I'm sorry, maybe I'm not understanding what you mean because I thought the Hill opinion's suggestion was we don't get into possibilities that are outside the realm of the real. And so even if the language could be construed that way, we have to see whether New York has ever prosecuted that. Right. We don't get into legal imagination and crazy hypotheticals when the reach is unclear and there's no case law. But as this Court said in Hylton, and this is in our briefs, 897F3rd57 at page 63, the realistic probability test is obviated by the wording of the state statute, which on its face extends to conduct beyond the definition of the corresponding federal offense. So that is what we have here. In Steinberg, the Court cited this statute and also section 15 of the New York penal law, which says you can commit an offense by omission, and it said you can commit New York first-degree manslaughter by omission, by doing nothing. On its face, the statute is therefore overbroad, and therefore under Hylton, we do not look for cases. We don't have to dream up crazy hypotheticals because we already know. Because we look at the statute, we see it's overbroad, and we look at the New York Court of Appeals. The problem is New York said that in a case where the defendant did initiate the action that ultimately caused death. Mr. Steinberg beat his daughter on the head. Where have they ever prosecuted anyone where they weren't the initiator and then guilty of omission? We submit Santiago fits that bill. It's in our briefs. But even if the Court disagrees, as Your Honor noted in her opinion in Villanueva, given that over 90% of cases result in pleas, we don't necessarily have a factually identical case in every scenario. You've got to satisfy Hill. I'm sorry? You've got to satisfy Hill. I mean, you do have to admit that the case we've got, your client's case, is the more typical first-degree manslaughter, if not murder, case. The example you're hypothesizing doesn't seem to exist anywhere in precedent. Well, we know the question here is not whether a prosecutor has brought the case. The question is whether a prosecutor can bring the case. Your Honor said we don't rely on the forbearance. Is that a Hill standard? Well, Your Honor is mentioning Hill. I'm mentioning Hylton. If there's tension between them, I don't think there is tension between these two cases. Hill says in Hill the litigant dreamt up scenarios where you could commit Hobbs Act robbery by throwing chocolate sauce on a passport or something, things that don't exist in reality because they simply don't. Here there's not this lack of clarity. We look to a case and we require the litigants to find a case when there is doubt as to the reach of the statute. We're not sure if it's a match or not. Here we are sure it's not a match because New York's highest court has told us so. It says you can commit this offense by doing nothing, whereas the Federal requirement is that you do something. It is overbroad. And in this case when it's clear, as the Supreme Court said in Mathis, the inquiry is over. In Mathis the court said the elements of Mathis's crime, Iowa burglary, cover a greater swath of conduct than generic burglary under ACCA. And that disparity, the court says, resolves this case. We don't have to look for a factually identical situation because we know from the statutory language and from New York's highest court that the offense is overbroad. If your Honours would like me to talk about the guidelines issue... Well, doesn't it flow from the ACCA issue? Sure. Absolutely. I mean, do you treat them differently? Well, the arguments are certainly different. But you could take a minute. We gave a lot of time to the guidelines. I understand and I appreciate that, Your Honours. But, you know, the government alleged initially that this offense in New York fits three different enumerated offenses in the guideline. It seems to have abandoned its murder argument in its reply brief because it makes no argument that this offense lines up with a generic murder. So it argues that it's, first of all, voluntary manslaughter. But as we set out in the briefing, generic voluntary manslaughter, meaning how most states define it, is an intentional killing. You intend to kill the person. That's what distinguishes voluntary manslaughter from involuntary manslaughter. And, therefore, it's not a generic match here because the New York offense does not require intent to kill. It requires intent to seriously injure. It's overbroad when compared to the generic offense. As to aggravated assault, again, the government has failed. Oh, let me note, in this context, it is the government's burden to demonstrate by a preponderance that a majority of states define the enumerated offenses in a way that matches categorically with Mr. Scott's offense because here the government is the proponent of trying to impose a guidelines enhancement. And here the government has failed in its burden because it has not identified 26 states which define inaction as aggravated assault. The typical definition of assault or aggravated assault is that you do something. In the common law, it was the apprehension of a touching. You're threatening someone. You're throwing a punch. And battery completes that. And as the common law came into codified law, courts say in order to... In order to commit an assault or an aggravated assault, you have to take action. You have to do something. You can't just sit idly by and not move a muscle. Unless Your Honors have other questions. No further questions. Thank you, counsel. Thank you. We'll hear from the government. I think you reserved two or three minutes. Two minutes, counsel. Yes, Your Honor. Thank you. So just to close the loop on the forced clause argument, so the defense counsel refers to, you know, congressional purpose and plain language. I think if we take a step back and do what Leocal and Johnson say, what are we defining here? So Johnson said we're defining a violent felony. Let's use some common sense there. Leocal said the same thing for crime of violence. We're defining a violent felony here. So the notion that Congress intended to exclude murder and manslaughter from crimes of violence when deciding which repeat violent offenders are worthy of enhanced sentences, it doesn't make any sense. Congress has to rely ultimately on the raw material of the state statutes. They weren't defining a national crime. They look at the state statutes. That's what we're trained to do. As counsel pointed out, we have to do it meticulously. Yes, Your Honor. And that feeds into the generic manslaughter argument. That's point two of our respective briefs. And so the government has cited at least 28 states that define offenses of homicide. Some of them call them murder. Some of them call them manslaughter. Define them with the elements that encompass New York first-degree manslaughter. In other words, intent to cause serious bodily injury causing death. A majority of states define homicide offenses that way. The fact that some call them murder and some call them manslaughter is irrelevant. So the Supreme Court said that in Taylor. It said, do not rely on labels. So it actually gave an example at page 592. It gave an example of a Michigan statute which called it's traditionally what we know as burglary. It called it breaking and entering. And the court said, we don't resort to labels because there are states like Michigan that call burglary breaking and entering. What we look at are the elements. And that's precisely what we're doing, what we've offered in our brief, Your Honor. 28 states define murder or manslaughter to include the elements of New York manslaughter in the first-degree subdivision one. And just to finish that point here, it's particularly probative here that the sentencing guidelines, the enumerated offense used to say manslaughter and then it replaced it with voluntary manslaughter. The commission said, we're doing that. We want to now exclude involuntary manslaughter. We want to keep voluntary manslaughter as an offense that triggers the crime of violence for purposes of career offender. But the settled case law at that time recognized that distinction under New York law. So this court in Vargas-Sarmiento said, first-degree manslaughter is a crime of violence under the risk of force clause of 16b. But second-degree manslaughter is not. And it said that in the Jobson case, which is cited in Vargas-Sarmiento. And so case law, like this court's law, recognized that distinction in terms of what's encompassed within the concept of a crime of violence for the guidelines. The sentencing commission said it wanted to adopt that principle. It didn't cite those particular cases. But it said, we want to recognize voluntary manslaughter counts. Involuntary manslaughter doesn't. And so here, that's precisely what is coming within the scope of the generic definition. Thank you. Why didn't you appeal? I'm sorry, go ahead. Please. Why didn't you appeal on the grounds that the sentence was substantively unreasonable? Well, Your Honor, ultimately, it's a combination of a number of factors. I think one of the most important ones is that you recognize the incredibly difficult standard of establishing substantive reasonableness. And in addition here, the procedural unreasonableness is, in our view, so clear in terms of the district court's errors in both the force clause and the generic definitions of manslaughter and aggravated assault. And so essentially, that's the reason why. Judge Roger, you had a question? Thank you. Thank you. Thank you both. Very good argument. We'll reserve decision.